GENERAL ELECTRIC COMPANY, a New York Corpo-
ration, and WESTINGHOUSE AIR BRAKE COM-
PANY, a Delaware Corporation, Appellants, v.
DEE ANN BUSH, Individually, DEE ANN BUSH,
as Guardian Ad Litem for KEITH BUSH, an Incom-
petent, DEE ANN BUSH, as Guardian Ad Litem for
DEBORAH SUE BUSH, KEITH DAVID BUSH and
DONALD THORPE BUSH, Minors, Respondents.

No. 6632

June 20, 1972                         498 P.2d 366

[Rehearing denied August 30, 1972]

*Goldwater, Hill, Mortimer & Sourwine, Ltd.,* of Reno, for
Appellant General Electric Company.

*McDonald, Carano, Wilson & Bergin,* of Reno, and *Rust &
Mills,* of Sacramento, California, for Appellant Westinghouse
Air Brake Company.

*Bradley & Drendel,* of Reno, and *Boccardo, Blum, Lull,
Niland, Teerlink & Bell,* of San Jose, California, for Respond-
ents.

## O P I N I O N

By the Court, ZENOFF, C. J.:

On October 19, 1968, during the course of his employment, Keith Bush was horribly injured while assisting in the reassembly of a giant vehicle specially designed for use in open pit mining. The accident happened near the Kennecott Copper Company's operation at Ely, Nevada.

The vehicle was a Haulpak, a truck-type that has as one of its major component parts a heavy electrical control cabinet which consists of a metal box weighing about 1,130 pounds and which contains a variety of electrical components such as switches, relays and the like. The entire Haulpak unit was manufactured first and then shipped in parts by rail to Ely to be reassembled by the crew of Pioneer Equipment Company, the dealer, distributor and servicing company. Bush was a member of that crew. Westinghouse Air Brake Company was the primary manufacturer of the unit, General Electric Company designed and manufactured the electrical control cabinet. General Electric's design specified the use of certain eyebolts to which further reference will hereafter be made.

In order to place the cabinet onto the truck it was necessary to lift it by crane by means of a rigging that would be strong enough to get it into the air and placed on the truck chassis. To accomplish this two standard ⅝-inch threaded lifting eyebolts were mounted into metal blocks welded at each end of the cabinet's channelled frame. The eyebolts were manufactured to meet the standards of the American Society of Testing and Materials which for this size bolt was listed as having a minimum breaking strength of 3,900 to 4,000 pounds. Lifting at a 45-degree angle, the eyebolt is rated to withstand bending without cracking.

The eyebolts were in the cabinet at the time the shipment arrived in Ely. The rigging was accomplished with a chain of $\frac{5}{16}$-inch gauge, 34 feet long, run through each eyebolt and twice over the hook hanging from the lifting crane. There were double chain legs from the eyes to the hook and the excess chain was wrapped around the hook and legs and securely fastened. In that fashion a triangle was created. None of the evidence established the angle at the base legs to be less than 45 degrees which was the accepted critical safety angle for stress on the eyebolts. The acknowledged criteria is that the nearer to vertical the safer the rig.

No rigging diagram or warning was given by any of the manufacturers. The rigging crew was experienced and professional. A test lift was performed safely, then the cabinet was raised 8 to 12 inches into approximate position above the truck's fender where the cabinet remained suspended for about 20 minutes.

While the crew was aligning the cabinet with the fender and aligning both with the frame one eyebolt broke. This allowed the cabinet to drop at that end and slide down the fender toward the rear of the truck. Bush, who was under the suspended cabinet tending to his duties, was struck on the head and his skull was crushed. His injuries are such that he is among the living dead. He can neither communicate nor do anything for himself, nor will he ever be able to do so. His bowel, bladder and feeding needs must be accomplished for him. His mentality is seriously affected. He is paralyzed below the neck. His left eye is destroyed, his right eye is almost useless and although he does perceive, he is mute. His normal life expectancy is 39 years from the time of trial.

When the accident occurred he was married, his wife was three months pregnant and they had two other children. The jury favored the respondents with a verdict awarding damages to Keith for three million dollars, to his wife, Dee Ann, for $500,000 for loss of consortium and to their three children for $150,000, at $50,000 each, for their loss of companionship. The judgment was rendered against Westinghouse and General Electric, which included costs and disbursements.

The principal defense was that the bolt failed, not because it was defective in material or design, but because the workmen's rigging was not in accordance with the custom and practice to keep the angle at 45 degrees or above. They also sought to assert Bush's contributory negligence and assumption of risk. On appeal, they attack variously the trial court's instructions that related to the manufacturers for failing to

warn and instruct the crew on the rigging on the ground that the crew members were professionals and therefore knew or should have known the rigging requirements without a warning; that the damages were excessive and as to the wife and children, that their awards were beyond the law; that they were deprived from showing Bush's contributory negligence should have been an element for jury consideration; that the jury was incorrectly instructed on strict liability upon which doctrine the case was principally tried; and that a fair trial was denied these appellants because they were hastened into trial before they could adequately prepare their defense and that certain procedural steps prevented them from removing the case from the state court to the federal district court.

1. Appellants' first contention is based on the premise that the jury predicated liability on the companies' failure to warn and instruct the reassembly crew. Appellants' position is that such notice and warning is not required when the reassembly crew consists of professionals who not only know how to rig but also know the dangers attendant therewith. Their assignment of error is directed specifically to the trial judge's failure to sustain objections to respondents' line of questioning contrived to establish a duty to give warning.

The evidence showed that the rigging was in accordance with usage and custom in the trade. Had the companies required a different rigging, such as vertical lifts using a spreader bar which the companies claimed should have been done, suitable instructions or warnings to that effect would have been appropriate. Without them the riggers were free to use the accepted method they felt proper. Jacobsen v. Ducommun, Inc., 87 Nev. 240, 484 P.2d 1095 (1971).

2. The trial of the action established that the eyebolt suddenly fractured during a customary lifting operation. The eyebolt was shown to have been defective, possibly from previous use.

We have heretofore held that a defective product is dangerous if it fails to perform in the manner reasonably to be expected in the light of its nature and intended function. Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 470 P.2d 135 (1970). Beyond that a product being defective gives rise to strict tort liability even though faultlessly made if it was unreasonably dangerous for the manufacturer or supplier to place that

product in the hands of a user without giving suitable and adequate warnings concerning the safe and proper manner in which to use it. Pike v. Frank G. Hough Co., 467 P.2d 229 (Cal. 1970); Johnson v. Standard Brands Paint Co., 274 Cal. App.2d 331, 340, 79 Cal.Rptr. 194 (1969); Barth v. B. F. Goodrich Tire Co., 265 Cal.App.2d 228, 245, 71 Cal.Rptr. 306 (1968); Gherna v. Ford Motor Co., 246 Cal.App.2d 639, 651, 55 Cal.Rptr. 94 (1966); Canifax v. Hercules Powder Co., 237 Cal.App.2d 44, 52–53, 46 Cal.Rptr. 552 (1965).

The doctrine of strict liability for an injury caused by a defective product applies even though the supplier has exercised all possible care in the preparation and sale of his product. Restatement Second of Torts, Sec. 402A(2)(a); cf. Pike v. Frank G. Hough Co., supra. When classifying these riggers as "professionals" that term is used in the sense of their knowledge and experience in their particular skill, which is a highly variable factor as compared to the true sense of "professional" applied to doctors, lawyers, engineers and the like. Warning need not be given against dangers which are generally known (Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 858 (5th Cir. 1967)), but the hazard here was not one generally known to these workmen. Nothing in their work experience could have forewarned them of the defective bolt or that a vertical lift was the only safe method of lifting this cabinet.

Under strict liability the manufacturer is entitled to assume that his product will not be subjected to abnormal and unintended uses, and consequently no liability follows an injury resulting from an abnormal or unintended use. International Derrick & Equipment Co. v. Croix, 241 F.2d 216, 222 (5th Cir. 1957). But here, the eyebolts were being used for lifting as intended by a procedure that was approved by custom and usage in the trade. There was no misuse or abuse. The eyebolt was being used in a manner which the seller should have reasonably anticipated. Johnson v. Standard Brands Paint Co., supra; see also Preissman v. Ford Motor Co., 1 Cal.App.3rd 841, 82 Cal.Rptr. 108 (1969).

3.  We further disagree with appellants when they contend that contributory negligence and assumption of risk should have been allowed as defenses and that the district court erred when it refused to give the jury instructions on either or both. We must say parenthetically, first of all, that the jury might

well have concluded from the evidence that Bush, as a member of the rigging team, was properly stationed and doing what he should have been doing when the accident happened.[1]

The appellants point out that this action was prosecuted on three theories (a) that the eyebolt was defective (b) that the design of the lifting provision for the cabinet was defective, and (c) that the design was defective only in the sense that General Electric did not furnish a warning as to the proper use of the product. If the third theory was accepted by the jury, appellants claim it sounds in negligence and that therefore they were entitled to defense instructions on contributory negligence and assumption of risk.

Bush's contributory negligence would have had to consist of a failure to discover the defect in the eyebolt or to guard against the possibility of its existence (Seely v. White Motor Company, 403 P.2d 145 (Cal. 1965); Canifax v. Hercules Powder Co., supra; see Prosser, Strict Liability to the Consumer in California, 18 Hastings L.J. 9, 48–50 (1966)), nor is there evidence that the defect in the eyebolt was known to Bush nor to anyone for even upon visual inspection it would not have been apparent. Thus, he could not have assumed the risk of a danger that he did not know existed. Truckee-Carson Irr. Dist. v. Wyatt, 84 Nev. 662, 669, 448 P.2d 46 (1968); Downing v. Marlia, 82 Nev. 294, 299, 417 P.2d 150 (1966); Vierra v. Fifth Avenue Rental Service, 383 P.2d 777, 780 (Cal. 1963); Bee v. Tungstar Corp., 65 Cal.App.2d 729, 151 P.2d 537 (1944).

4. The trial court authorized the jury to award damages to respondent Dee Ann Bush, wife of the injured husband, as compensation for her loss of consortium. The jury awarded her $500,000. Appellants claim this to be error.

The question of the wife's right to recover for the loss of her husband's society has not been heretofore decided by this court. An aging doctrine based upon the danger that she was seeking a double recovery and that the loss of such things as companionship and society were too indirect to measure in terms of money discouraged her compensation. West v. City of San Diego, 6 Cal.Rptr. 289 (Cal. 1960). As time went on, however, the doctrine that the wife of an injured spouse has a right of action developed. Hitaffer v. Argonne Co., Inc., 87

---

[1] It is also hard to imagine that he would place his head where it was if it weren't necessary to his duties.

App.D.C. 57, 183 F.2d 811, 23 A.L.R.2d 1366 (1950). In Millington v. Southeastern Elevator Co., Inc., 239 N.E.2d 897, 36 A.L.R.3d 891 (N.Y.App. 1968), the New York court shifted from the old to the new and ruled that the consortium action on behalf of the wife although based upon the wife's right of support from her husband, more importantly, recognizes instead that consortium covers a variety of other intangible interests which the wife has in the welfare of her husband. These are described as "love, companionship, affection, society, sexual relations, solace and more." The court there emphasizes that the basis of the wife's recovery is the anguish which she suffers when the injury to her husband destroys or impairs those components that make for the traditional marriage she enjoys and that the right to support is not included nor a part of her claim.

This character of harm is real and substantial rather than illusory. Incontestably, the transformance of the husband in this case into a permanent invalid impairs the wife's relations with her husband. In all respects the serious harm that the sadness, shock and anguish of seeing a spouse suffering from all kinds of physical injury, in addition to her complete inability to ever again bear children by her husband is fundamentally injury that the wife suffers separate and distinctly apart from the question of support. See Gates v. Foley, 247 So.2d 40, 42 (Fla. 1971), for a listing of states which recognize this cause of action.

In the light of the foregoing the danger of double recovery is not real for presumably the husband is recovering for his own injuries and she is recovering for injury done to herself by the loss of his companionship. There is no duplication, instead, this is an example of a single tortuous act which harms two people by virtue of their relationship to each other. To eliminate the danger that there would be a double recovery a precaution would be to charge the jury that the wife's compensation for loss of her husband's society and companionship should not include additional damages for her right to support. See generally, Professor Homer Clark, the Wife's Action for Negligent and Permanent Loss of Consortium, 3 Family Law Quarterly 197 (Sept. 1969);[2] Troue v. Marker, 252 N.E.2d 800 (Ind. 1969).

As an additional safeguard against the danger of double

[2]Professor Clark, among other factors, places a value on the loss of the wife's sexual relations and states, ". . . presumably today even the judiciary, that stronghold of male supremacy, is aware that women enjoy sex."

recovery we require that she will have her cause of action only if joined for trial with the husband's own action against the same defendant. Thill v. Modern Erecting Company, 170 N.W.2d 865, 869 (Minn. 1969).

5.   Are the children of a father injured by the negligent acts of third persons entitled to maintain independent actions to recover damages for their loss of consortium with their father the same as their mother?

The trial court instructed the jury that the children had a cause of action for their individual losses occasioned by their father's injuries. The jury awarded the three minor children the sum of $150,000.

Only one court has recognized their cause of action. Scruggs v. Meredith, 134 F.Supp. 868 (D.C. Hawaii 1955) (reversed on appeal by authority of Halberg v. Young, 41 Hawaii 634, 59 A.L.R.2d 445 (1957)). Substantial differences exist in the consideration of the children's claim as against that of their mother, all of which have compelled the overwhelming weight of authorities to be against an action for the children. Halberg v. Young, supra; Annot., 59 A.L.R.2d 454 (1958); Hayrynen v. White Pine Copper Co., 157 N.W.2d 502 (Mich.App. 1968). We are satisfied to await legislative action, if any, on this issue.

6.   Appellants challenge the award of $3,000,000 as exorbitant, yet, the evidence of special damages went unchallenged and uncontroverted at the trial. We will not substitute our opinion of damages for that of the jury. Southern Pacific Co. v. Watkins, 83 Nev. 471, 495–96, 435 P.2d 498 (1967). The award, in view of the damage done, does not shock our judicial conscience.

7.   Appellants "shotgun" a number of alleged suberrors, i.e., refusal or failure of the trial court to decide or rule on certain objections to interrogatories, frustrations of appellants' attempt to take a certain deposition of a member of the Nevada Industrial Commission, undue delay in granting leave to file third-party complaints and refusal to grant a continuance. No case authority is cited, therefore, this court will not entertain any of those assignments of error.

8.   All of the respondents in the action are residents of Nevada. All of the defendants are foreign corporations with the

exception of defendant American Standard, Inc., a Nevada corporation. Respondents had never shown facts sufficient to support a cause of action against American Standard. Appellants contend that American Standard should have been eliminated from the action at an early stage which would have permitted them to attempt removal of the action to the federal court. Instead, they claim, the trial court delayed dismissal against American Standard until it was too late to do so.

Their failure to exercise the option in a timely fashion constituted a waiver of the right to removal. Grigg v. Southern Pacific Company, 246 F.2d 613 (9th Cir. 1957); Southern Pacific Company v. Haight, 126 F.2d 900 (9th Cir. 1942); Waldron v. Skelly Oil Co., 101 F.Supp. 425 (D.C.E.D. Mo. 1951).

Affirmed, save and except that the award to the children is reversed and set aside.

BATJER, MOWBRAY, THOMPSON, and GUNDERSON, JJ., concur.